AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Mervina DeGuzman,<br><br>*Defendant(s)* | Case No. 3-19 71447<br>JCS |

FILED
SEP -4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT ~~UNDER SEAL~~

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __March 5, 2018__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: _/s/_

WILLIAM FRENTZEN
Assistant United States Attorney

_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 9/3/19

_Judge's signature_

City and state: San Francisco, California   Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

### I. INTRODUCTION

#### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for Mervina DEGUZMAN ("DEGUZMAN").

2. There is probable cause to believe DEGUZMAN engaged in a scheme to commit Medicare fraud by introducing home health marketers to physicians willing to accept kickbacks in exchange for home health and/or hospice patient referrals. Further, while employed as a nurse at a skilled nursing facility located in Oakland, California ("CA"), DEGUZMAN accepted kickbacks in exchange for patients referrals in violation of in violation of 42 U.S.C. §1320a-7b(b).

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with DEGUZMAN in 2017 and 2018 in which DEGUZMAN received kickback payments in exchange for the referral of patients. DEGUZMAN also introduced CW-1 and UCE to co-

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

conspirators willing to engage in the scheme and received compensation from UCE for those introductions.

### B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

5. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

6. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

7. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

8. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate

entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

9.  In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

4

employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

10. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

11. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

12. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

13. MERVINA DEGUZMAN, is a 41 year old female residing in the San Jose, CA area. DEGUZMAN's last known employment was as a nurse with Oakland Heights Nursing and Rehabilitation ("Oakland Heights") in Oakland, CA. During the course of the investigation DEGUZMAN accepted kickbacks from CW-1 and UCE in exchange for steering patients from Oakland Heights to HHA Alpha. DEGUZMAN was paid $500 cash for each patient she referred to HHA Alpha. DEGUZMAN also facilitated the payment of kickbacks by introducing CW-1 and UCE to physicians willing to engage in the scheme.

### E. STATUTES VIOLATED

14. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

15. **Title 42, United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. DEGUZMAN ARRANGES THE KICKBACK SCHEME

16. In January 2017, CW-1 identified Mervina DEGUZMAN ("DEGUZMAN") as the Director of Nursing for Canyon Springs Post-Acute ("Canyon Springs") in San Jose, CA.

17. Because of her position with Canyon Springs, DEGUZMAN maintained numerous relationships with physicians in the San Jose, CA area. DEGUZMAN used her connections to engage in a kickback scheme, directing patients to certain facilities in exchange for cash.

18.     On May 15, 2017, CW-1 and UCE recorded a meeting with DEGUZMAN and her acquaintance, ("CO-CONSPIRATOR 1")[6], to propose a business partnership. During the meeting, CW-1 explained s/he and a business partner (UCE) would be purchasing HHA Alpha and were looking to increase the patient population prior to the purchase. As part of their agreement, DEGUZMAN would introduce CW-1 and UCE to individuals willing to steer patients to HHA Alpha in exchange for kickbacks. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Especially if we're willing to pay, if you know what, as you said you know what the relationships are now, and if we add another 50 to that, 100 to that, they'll be like "yea I'll break you off a little". Does that sound fair? |
| DEGUZMAN: | Yeah. |
| UCE: | Ok. So that's what we looking for. And…so, I'd be…I don't want you to have to drive everywhere under the sun. But I definitely need your help to burst through the door. |
| DEGUZMAN: | Ok. |
| UCE: | They'll be like who the fuck are you? |
| DEGUZMAN: | Basically I find your resource right? I find your resource and I help you build…and just ramp up. Slowly ramp up. |

19.     In return for her assistance, UCE offered DEGUZMAN a percentage of the profits generated by patients referred through her contacts and/or compensation for each introduction she made to those willing to engage in the scheme. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | I respect your time and I do want to make it worth it. That's why if you know the person who you think is good. Have the conversation with them upfront. I want them to be people that are onboard…that you've worked with before and if they are like, if they are like "no, you need to be the one showing up here every month"…fuck that. There enough business out there we don't have to do it. I don't want it to be a burden on you, cause that's what I'm here for. |

---

[6] Throughout this affidavit the names of co-conspirators not charged during this investigation have been redacted.

7

| | |
|---|---|
| DEGUZMAN: | You know what if it's worth my time and energy, I wouldn't mind, right? Spending that time, spending that energy. You know that stuff, but it has to be worth my…not just the client's…my energy. |
| UCE: | Right, but see what I'd rather see is the leg work from here to there-- the biggest payoff is at the end. So decide what that payoff is. I'm happy to give you something in between. I'm happy to give you something in between that makes it worth your while for every visit that we get off the route, that's working. And it's gonna start slow with me, does that make sense? |
| CO-CONSPIRATOR 1: | Yes it does. Why don't you write a proposal and then send it to them. |
| DEGUZMAN: | No it's the other way around. Why don't I give you a blank piece of paper and you do the proposal… |

20. DEGUZMAN declined this offer to work with CW-1 and UCE. During a recorded call on May 17, 2017, DEGUZMAN requested a legitimate position with HHA Alpha along with a salary. However, CW-1 was unable to accommodate DEGUZMAN's request.

21. DEGUZMAN later accepted CW-1 and UCE's offer, contacting CW-1 via text message to initiate their kickback arrangement. On or about November 2, 2017, DEGUZMAN sent CW-1 a text message accepting CW-1's offer, stating "I'm taking your offer. Pls email me The contract ASAP. Our first meeting is a big Mountain View Doctor ("Doctor 1")[7]. Please get ready". DEGUZMAN further requested she also be paid for any introductions, stating "I want it to have a now income and later investment".

22. On or about November 6, 2017, CW-1 contacted DEGUZMAN on her cellular telephone and recorded their discussion about the upcoming meeting with Doctor 1. During the call, DEGUZMAN advised CW-1 how to draft a fraudulent consulting contract with Doctor 1. DEGUZMAN explained the purpose of the contract was to disguise Doctor 1's kickback payments as legitimate work provided to HHA Alpha. DEGUZMAN further explained the contract was necessary as paying for patients was illegal. Below is an excerpt of the aforementioned exchange:

---

[7] Throughout this affidavit the names of physicians not charged during this investigation have been redacted.

8

| | |
|---|---|
| DEGUZMAN: | So so what I was gonna suggest to you, is when you deal with [Doctor 1] you get one of her doctors staff to be you associate medical director, not her directly, ok? |
| ... | |
| DEGUZMAN: | So so so but in the mean time you can say that you can do a contractual, contractual work, like her work, her paid work is based on caseload, but it's it's the politically correct way to say, you know? They're not paid patients, but you know you cannot pay for a patient, cause it's illegal, but then you can pay for labor. |

23. On or about November 11, 2017, DEGUZMAN sent CW-1 a text message offering to introduce CW-1 and UCE to a physician in the San Jose area, Dr. Tam NGUYEN (referred to as "Dr. Tam" in DEGUZMAN's message and hereinafter referred to as "NGUYEN"). DEGUZMAN offered to accompany CW-1 during a visit to NGUYEN's office, stating "Ok I will have you deliver to Dr. Tam, which will give you and [UCE] the chance to talk to him". CW-1 asked DEGUZMAN to "talk to him [NGUYEN] before and explain what we are doing so it's not too uncomfortable for us" to which DEGUZMAN responded "Absolutely!" Based on this exchange, CW-1 understood DEGUZMAN was willing to discuss the kickback scheme with NGUYEN prior to meeting CW-1.

**B. DEGUZMAN INTRODUCES CW-1 TO A CO-CONSPIRATOR**

24. On November 15, 2017, DEGUZMAN accompanied CW-1 to a meeting with NGUYEN at NGUYEN's medical office in San Jose, CA. The purpose of the meeting was to introduce CW-1 to NGUYEN and discuss the kickback for patient referral scheme. During the meeting, DEGUZMAN suggested CW-1 avoid a "paper trail" by paying NGUYEN in cash, thereby concealing their illicit relationship. At the end of the meeting and in the presence of DEGUZMAN, CW-1 paid NGUYEN $1,000 cash as a good faith payment for starting their kickback relationship. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | And and you can't do transactions with paper trail? |
| CW-1: | No. Unless you want to. Unless there is no mind and my name is not on there, do it [laughs]. |
| ... | |

9

| | |
|---|---|
| DEGUZMAN: | Cause the only two ways they can do it is either you know they compensate for your time for cash or they do the…they sign you under the merger company or whatever he calls his company. |
| CW-1: | If you have to do checks we can do that but again…why keep a paper trail? |
| DEGUZMAN: | I know I think the cash is better. |
| … | |
| DEGUZMAN: | So just like a couple a month…I mean like a couple patients a month average is all. |
| CW-1: | We do two to three and and then we raise is slowly and then in 11 months if you want to be exclusive. |
| DEGUZMAN: | Wait til the acquisition basically to grow. |
| … | |
| CW-1: | So what I have [unintelligible] as a thank you, uhh, good faith, at least you know, we're not lying, we're not making any stupid mistakes and then we can sit down with Mervina and figure out how we can do it. If you have different numbers, we can talk about those numbers. It's kind of an uncomfortable topic, but be open be more communicative so we understand, so you don't feel like hey I'm low-balling you or I'm just not doing what I'm supposed to do cause I know what the market is doing outside. |
| DEGUZMAN: | Yeah. |
| CW-1: | Better that we don't want to get into a bidding war, so thanks boss. |
| NGUYEN: | Thank you. |
| CW-1: | I will leave this for you. |
| … | |
| NGUYEN: | What's this? |
| CW-1: | A thousand dollars. |
| NGUYEN: | Oh. |
| CW-1: | Just a good faith, like hey we are not bullshitting. |

10

25.     Following the meeting on or about November 17, 2017, CW-1 received a text message from NGUYEN. The message advised CW-1 of a patient referral NGUYEN was sending to HHA Alpha, "Please check your fax it [the patient referral paperwork] should come and hope you can open the case".

26.     During the course of the UCO, NGUYEN referred over 40 patients to HHA Alpha. NGUYEN met regularly with UCE and CW-1 and accepted a total of $20,000 in kickback payments in exchange for patient referrals.

### C. DEGUZMAN INTRODUCES CW-1 AND UCE TO DR. ZHENG ZHANG

27.     On or about November 15, 2017, DEGUZUMAN and CW-1 discussed DEGUZMAN's influence with another physician, Dr. Zheng ZHANG ("ZHANG"). During their conversation, CW-1 offered to compensate DEGUZMAN for an introduction to ZHANG. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | So after Tam [NGUYEN] quit that hospitals Zhang became king. It use to be him but no more. Now Zhang is king. Zhang is the one. And he's funny. So anybody that goes to him as a vender, out of fun, introduce vendors to him right? Out of fun because we know he's not going to deal with them. Um and they ask him questions and you know what he tells them? |
| CW-1: | Talk to Mervina? |
| | *laughter* |
| DEGUZMAN: | Yes! In front of me. I say Dr. Zhang this is very embarrassing please don't say that in front of me…I say tell them secretly and he says 'but it's up to you". |
| … | |
| CW-1: | We're fixing so much damage that she has done but we've overcome so much off it. But we just have to do it the right way. And again, any connection, I'm sure I already told you. If you introduced us you get the referral fee.. |
| DEGUZMAN: | He's still good but Zhang is now the bigger. Because he quit. |
| CW-1: | Oh so we do Zhang we get the referral fee for that too. The 30% that you get hopefully. |

11

28.    On or about November 13, 2017, DEGUZMAN contacted CW-1 to discuss introducing CW-1 to ZHANG. During the call, DEGUZMAN explained how ZHANG expected to be paid for patient referrals. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | With Dr. Zhang I just finished talking with him just now. |
| CW-1: | Ok. |
| ... | |
| DEGUZMAN: | So what I wanted to umm ask from you is because he thinks in his mind hospice is a different price than home health. |
| DEGUZMAN: | And then they increase in price, this is how you motivate doctors to give more. |
| CW-1: | We want to stay within five and see how it works. |
| DEGUZMAN: | Right. |
| CW-1: | We don't want to change the number way up high. |
| DEGUZMAN: | Oh ok. |
| CW-1: | So what what... |
| DEGUZMAN: | So for for home health it's $400. |
| CW-1: | Ok that's doable no problem. |
| DEGUZMAN: | Yeah. |
| CW-1: | And then what about hospice. |
| DEGUZMAN: | And then for hospice umm what they do, is they, of course they have to, not be dead the next day. |
| CW-1: | Right right. |
| DEGUZMAN: | Right, so the referral, the average is $750, average. |
| .... | |
| DEGZUMAN: | So if he refers today I want him to get compensated for his referral. |

12

| | |
|---|---|
| CW-1: | On Friday we'll do it no problem. |
| DEGUZMAN: | Yeah so I will tell him ok. |

29. On or about November 17, 2017, DEGUZMAN arranged a dinner in San Jose, CA for ZHANG, CW-1, and UCE. During the dinner and in the presence of DEGUZMAN, UCE offered to pay ZHANG for patient referrals and negotiated the price of each referral. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | We'll give you 750 for the hospice patients. If it [the patient care] lasts more than a month [unintelligible] we'll pay you 20% more, which is one-fifty for the next month. Does that, does that [unintelligible] your expectations? |
| … | |
| UCE: | If these numbers don't make sense to you based on other relationships you have please tell me. We don't…we don't want you to be dissatisfied and you know lose interest. We'd rather match what our competitors are paying and keep you engaged so are these numbers ok [unintelligible]? |
| ZHANG: | Yes. |

30. At the conclusion of dinner, UCE presented ZHANG with an envelope containing $1,000 cash as a good faith payment to begin their arrangement. ZHANG accepted the envelope, which UCE understood to be ZHANG's acceptance of the terms discussed during the dinner. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So uhh doctor uhh…I think we have a good agreement you know this entire relationship is based on faith so uhh I have an envelope with a thousand dollars. It's a down payment because this entire relationship is based on faith and we trust we have a good relationship. |
| ZHANG: | Alright. |
| UCE: | Ok? |
| ZHANG: | Thank you. |

31. Immediately following the dinner, UCE paid DEGUZMAN $1,000 cash for the

13

introductions to ZHANG and Doctor 1. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | He [Dr. ZHANG] likes that. |
| UCE: | Yep. And I'm sure you'll get her [Doctor 1] on board. |
| DEGUZMAN: | Yeah…they're gonna be on board. |
| UCE: | A thousand for you ma'am thank you very much. |
| DEGUZMAN: | Thank you so much |

32. On the following day, on or about November 18, 2017, ZHANG sent a text message to UCE and CW-1 advising that he was sending a patient referral, "Ref ["Patient 1"][8] for hhc [home health care] going home today" and "Need fax number to send".

### D. DEGUZMAN ACCEPTS KICKBACKS FOR PATIENT REFERRALS SENT FROM OAKLAND HEIGHTS TO HHA ALPHA

33. Later during the course of the UCO, DEGUZMAN was hired as a nurse with Oakland Heights, a rehabilitation facility located in Oakland, CA. DEGUZMAN used her new position to steer patient referrals from Oakland Heights to HHA Alpha in exchange for cash payments from CW-1 and UCE.

34. On or about January 30, 2018, DEGUZMAN sent UCE and CW-1 a group text message, stating "I'm working in Oakland. Average 30-45 skilled discharges a month, 80% Medicare". UCE understood DEGUZMAN's text to be an offer to refer Medicare patients from Oakland Heights to HHA Alpha.

35. On or about February 28, 2018, DEGUZMAN sent a text message to CW-1 advising she was referring a hospice patient to HHA Alpha. DEGUZMAN also advised the text message that she would "have more discharges [patients] next week".

36. On March 5, 2018, DEGUZMAN met CW-1 and UCE near Oakland Heights. The purpose of the meeting was to pay DEGUZMAN for the referral of a patient from Oakland Heights.

---

[8] Throughout this affidavit, I have removed patients' names to protect their privacy, and have referred to them instead as "Patient 1," "Patient 2," etc

During the meeting, UCE asked who ordered the services as UCE was willing to pay the referring physician if he or she was onboard with the kickback scheme. DEGUZMAN clarified she referred the patient herself, stating "that was just...me". In exchange for the referral, UCE handed DEGUZMAN an envelope containing $500 cash. DEGUZMAN offered to use the money by taking NGUYEN to dinner to maintain NGUYEN's relationship with CW-1 and UCE. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So was this...was there there a doc who's here on board or was that just... |
| DEGUZMAN: | That was just...me. |
| UCE: | It's just you doing it? |
| DEGUZMAN: | Yeah. |
| UCE: | Ok. Well...if you want...we'll give you something |
| DEGUZMAN: | You're gonna give me dinner money [unintelligible] Dr. Tam maybe...if he does not...if he stops...ya know keeping in touch. |
| UCE: | Anyway. |
| CW-1: | It's just for the patient. |
| ... | |
| UCE: | So this is for the patient thank very much. |
| DEGUZMAN: | Thank you. |

37. On or about March 13, 2018, DEGUZMAN sent UCE a text message advising "I have referrals, and I need to talk to him [CW-1] after my meeting". The CW-1 replied via text message offering to meet DEGUZMAN and "thank" her for the referrals, "M [DEGUZMAN], I should stop by to thank you and bring some paperwork".

38. As indicated in her text message, from March 13, 2018 to March 28, 2018, DEGUZMAN referred at least six patients to HHA Alpha, including five Medicare beneficiaries.

39. On March 28, 2018, UCE sent a text message to DEGUZMAN asking to set up a meeting to "thank" her for the referrals. DEGUZMAN agreed to the meeting but suggested they move the meet

15

location in order to avoid a security camera in the parking garage, texting "CCTV in the garage LOL". UCE agreed to move the meeting to his/her car, to which DEGUZMAN joked via text message, "sounds like mafia hahaah".

40. During their meeting, DEGUZMAN was paid $3,000 cash for the referral of the six patients noted above. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Alright um so I've got um so six patients right? |
| DEGUZMAN: | Yeah. |
| UCE: | Okay so I got that and then I've got a, uh can I show you the contract real quick? |
| DEGUZMAN: | Yeah yeah yeah. |
| UCE: | So let me just do this, uh so this is three thousand [dollars]. |
| DEGUZMAN: | Okay. |

### III. PROBABLE CAUSE FOR THE VIOLATION

#### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

41. Title 42, United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42. Based on all of the foregoing, probable cause exists to believe that DEGUZMAN accepted kickback payments from UCE that were intended to induce DEGUZMAN to refer patients to HHA Alpha for home health and/or hospice services later billed to Medicare.

43. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by DEGUZMAN for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

44. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by DEGUZMAN in exchange for cash payments by UCE meets the definition of a kickback payment and violates anti-kickback statute.

### B. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(2)(A), THE ANTI-KICK BACK STATUTE

45. **Title 42 United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

46. DEGUZMAN facilitated UCE's kickback payments to NGUYEN and ZHANG in order to induce NGUYEN and ZHANG to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

47. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by NGUYEN and ZHANG for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(2)(A).

48. Therefore, there is probable cause to believe that DEGUZMAN's facilitation of UCE's kickback payments to NGUYEN and ZHANG to induce NGUYEN and ZHANG to send patient referrals to HHA Alpha meets the definition of a kickback payment and violates the anti-kickback statute.

### IV. CONCLUSION

49. Based on the foregoing, there is probable cause to believe DEGUZMAN conspired to facilitate the payment of kickbacks to co-conspirators in exchange for patient referrals and likewise accepted kickbacks in exchange for the referral of patients while employed at a skilled nursing facility, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and (b)(2)(A).

## V. REQUEST FOR SEALING

50. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 3rd day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge